# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 22, 2011

## STATE OF TENNESSEE v. ALBERT W. BENTLEY

**Appeal from the Criminal Court for Davidson County**
**No. 2009-A-376     J. Randall Wyatt, Jr., Judge**

_____

**No. M2010-01882-CCA-R3-CD - Filed December 29, 2011**

_____

A Davidson County jury convicted Defendant-Appellant, Albert W. Bentley, of aggravated robbery, a Class B felony. He was sentenced as a Range I, standard offender to a ten-year term of imprisonment in the Department of Correction. In this appeal, Bentley presents the following issues for our review: (1) whether the trial court erred in denying his motion to suppress the photographic lineup in which the victim identified Bentley as impermissibly suggestive; (2) whether the evidence, primarily the victim's in court identification of Bentley, was sufficient to support his conviction. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. JOSEPH M. TIPTON, P.J., filed a concurring opinion.

Dawn Deaner, District Public Defender; Jeffery A. DeVasher, Assistant Public Defender, (on appeal); Jonathan F. Wing and Kristin Stangl, Assistant Public Defenders (at trial), Nashville, Tennessee, for the Defendant-Appellant, Albert W. Bentley.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; Amy Eisenbeck and Allen Grant, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial.** David Boyd, the victim in this case, testified that in September 2008, he was earning a living, in part, by selling clothes, shoes, and various other items out of his car and at flea markets, homecomings, and street festivals around Nashville. Potential customers would commonly call him to inquire about his wares. On September 9, 2008, the victim spoke on the phone with a man asking about shoes, specifically size eleven Nike Air Jordans

or Air Force Ones. The victim had a pair of Air Force Ones in that size, and he arranged to meet the man in the parking lot of Harper's Restaurant ("the restaurant") on Jefferson Street between 4:00 and 5:00 p.m. The victim went to the restaurant with the pair of shoes and waited outside his car for someone to arrive. Eventually, the victim saw a man, whom he identified during the trial as Bentley, walk toward him from behind the restaurant. Another man was with Bentley, but he stayed behind in the alley, talking on a phone. Bentley asked the victim about the shoes. In a conversation that lasted "five minutes at the most," Bentley asked whether the victim had any other shoes, such as Jordans, in addition to the pair of Air Force Ones that the victim brought to the meeting. The victim told him that he did not and was unsure whether he would be getting any other kinds of shoes in the near future. Bentley decided he did not want to buy the shoes, and the two parted ways. Bentley and his companion walked back in the direction they had come, behind the restaurant. The victim drove away in his car. During the conversation, the victim and Bentley were within a couple of feet of each other.

Within three minutes of leaving the restaurant, the victim received a call from Bentley, asking him to return to the restaurant because Bentley had changed his mind about buying the shoes. The victim returned to the restaurant and parked in a different parking spot. It was still daylight outside, and the victim saw Bentley and the other man approach from the direction of Family Dollar, which neighbored the restaurant. The victim stayed in his car, and when the men got to the car, Bentley stood outside the driver's door, put his hand on the roof of the car, pulled a gun out of his waist and said, "[T]his is a robbery." The victim gave Bentley the shoes, and Bentley asked where Boyd had put the rest of his "stuff." The victim understood this to mean that Bentley expected him to have more goods with him. The victim told Bentley that the one pair of shoes was all he had with him. The other man, who was also beside the driver's door, told the victim that Bentley was "serious," that "he will shoot you." Bentley then told the victim to let him in the car, and Boyd refused. The other man reached into the car to grab the keys but was unsuccessful. Bentley and the other man then walked away. The victim estimated that the robbery took less than five minutes. When Bentley pointed the gun at the victim, the victim was afraid.

In response to the victim's call to 911, an officer responded to the restaurant and took a report. Sometime later, the police notified the victim that they had identified fingerprints taken from his car and requested that he view a photographic lineup. The officer who conducted the lineup did not tell the victim that they suspected any particular individual in the lineup or suggest who the victim should select. The victim identified Bentley as the person who robbed him. The victim was "100 percent sure" that he had identified the robber who held a gun to him, based on his opportunity to observe Bentley from a short distance during both encounters with him. In previous court proceedings, the victim also identified Bentley as the person who robbed him.

The photographic lineup viewed by the victim, exhibit 1, and a copy of the same lineup with a circle around Bentley's photo, the victim's initials, and the date, exhibit 2, were admitted at trial. On cross-examination, the victim testified that he saw Bentley with a gun, and that he had the impression that the other man also had a gun under his clothing. He acknowledged that he may have told the police that both men had a gun, based on his impression that the man with Bentley had a gun under his clothing.

The robbery occurred on a Tuesday afternoon, around 5:00 or 6:00 p.m, and Jefferson Street was busy. The restaurant and Family Dollar were both open, and people were walking in and out of both. The victim testified that he had an astigmatism that affected his ability to see objects at a distance. He was required to wear prescription eyeglasses to drive, and he was wearing his glasses during the robbery. While he was talking with the 911 operator describing the men, the victim could still see them. The victim described them to the operator as two young black males, one wearing a white t-shirt and the other wearing a white "wife beater" style t-shirt. When the patrol officer came to the restaurant, the victim again described the men. He described Bentley as a black male, wearing a white t-shirt, shorts, and a hat. The victim believed that Bentley had "dreads" underneath the hat, was about six feet tall, and weighed about 175 pounds. The victim did not remember seeing any tattoos on Bentley. The victim testified that Bentley used a dark-colored semiautomatic pistol. He said that he told the officer that it was "dark silver . . . maybe gray."

When the victim went to the police department to view the lineup, he was aware that the police had identified someone through fingerprints, and he assumed that person would be included in the lineup. After the victim identified Bentley as the robber, the officer informed him that he had identified the same person whose fingerprints matched those collected from his car. The victim was confident in his identification of Bentley as soon as he saw Bentley's face in the lineup. The victim testified that with his business, he often has many strangers around his car.

Detective Robert Hanson was assigned to investigate the instant robbery. On September 11, 2008, he learned that fingerprints taken from the victim's car had been identified as belonging to the victim and Bentley. Detective Hanson called the victim and asked whether he knew anyone by the name of Albert Bentley. The victim responded that he did not. Hanson arranged for the victim to view a photographic lineup that included Bentley's photo. Detective Hanson created the lineup by using the photographs of Bentley and finding five other photographs of people with similar characteristics, including gender, hairstyle, facial hair, and other physical traits. Before the victim looked at the lineup, Hanson told him that the person who committed the crime may or may not be in the lineup and that he should keep in mind that hairstyles and facial hair can change.

-3-

Detective Hanson identified exhibit 1 as the lineup that he showed to the victim. Hanson printed it in "gray scale" rather than color so that the photographs would appear more uniform. The photograph of Bentley that Detective Hanson used was around three years old at the time. Detective Hanson identified exhibit 2 as the lineup after the victim had viewed it and selected Bentley as the perpetrator of the offense. He identified exhibit 3 as a document listing information about the lineup, including the names of the individuals included in the array and the date and location of where it was shown. He explained that the victim did not see this information before viewing the lineup.

On cross-examination, Detective Hanson testified that the description in the initial police report was vague and generally described many people. Because of this vagueness, he could only create a lineup after the fingerprint was identified as Bentley's. After the victim identified Bentley's photograph, Hanson told the victim that the fingerprint belonged to the same person. An aerial photograph of the restaurant, Family Dollar, and the surrounding intersections was admitted as exhibit 4. Detective Hanson testified to the relative location of these establishments based on the photograph. He acknowledged that Jefferson Street was a busy street, and especially so at the time of the robbery. Four photos of the restaurant, Family Dollar, and their shared parking lot, where the robbery occurred, were admitted as exhibit 5. Detective Hanson did not speak with any other witnesses about the crime, nor did he obtain any security camera recordings from the stores. He did not find a gun during the investigation of the robbery. In the police report, the victim described the gun as being silver.

Detective John Tuberville of the Metropolitan Nashville Police Department testified that he was a patrol officer in September of 2008. On the day of the robbery, he responded to the crime scene and spoke with the victim. He applied fingerprint dust to the area above and around the victim's driver side car door, and he discovered and lifted a number of prints. The fingerprints, including the envelope containing them, were admitted as exhibit 6. On cross-examination, Detective Tuberville said that fingerprints can remain on a surface for a long period of time if they are not disturbed, and that the metal surface of a car would hold prints well. He testified that it was not raining on the day he lifted the prints. He did not know when the prints were left on the car.

Linda Wilson, an identification analyst for the Metropolitan Nashville Police Department, identified the fingerprints recovered by Detective Tuberville as belonging to the victim and Bentley. In identifying Bentley's prints, she initially used a local computer database comprised of the known prints of around 400,000 people. The database returned a list of fifty possible matches. These possible matches were ranked according to the number of points of similarity they had with the unknown prints. Bentley's prints ranked highest, with 5,000 points of similarity out of a possible 10,000. Wilson said that it is not uncommon to have more points of similarity. She next visually compared the prints using a magnifying

glass and particular lighting. Wilson identified a print corresponding to Bentley's left little finger. This identification, as with all fingerprint identifications performed in her office, was checked and verified by one of Wilson's supervisors or another identification analyst. A document reporting Wilson's determinations was admitted as exhibit 7.

The defense called Detective Stanley Truitt, who was the responding patrol officer on the date of the robbery. Truitt completed a report based on his discussions with the victim. Detective Truitt reported that the victim said the gun was a silver color. The victim described the perpetrator as five feet, ten inches tall, 175 pounds, with "dreads." The second person was described as five feet, ten inches tall, 175 pounds, with black hair in "dreads." Detective Truitt did not report that Boyd described any tattoos or scars on either man. Detective Truitt testified that Bentley was arrested on September 19, 2008. Photographs taken of Bentley at the jail after his arrest, along with information about Bentley compiled at the time of his arrest were admitted as exhibit 8. The photographs, in addition to a standard mug shot, depict tattoos on Bentley's cheek, neck, and arm.

On cross-examination, Detective Truitt testified that Bentley's actual height was five feet, eleven inches, or within one inch of what the victim had reported to Truitt. Bentley's actual weight was 160 pounds, or within fifteen pounds of what the victim reported. Detective Truitt testified that the booking information accompanying the photos taken of Bentley at the time of his arrest did not mention any tattoos, even though the form included a space for such information.

After trial, the jury convicted Bentley as charged in the indictment. He was later sentenced to a ten-year term of imprisonment in the Department of Correction. This appeal followed.

**I. Victim's Identification of Defendant**. Bentley argues that "the pretrial photographic lineup prepared by police from which [the victim] identified the defendant was so suggestive as to violate his rights to due process of law." As a result, he asserts that the trial court erred in denying his motion to suppress Boyd's identification testimony. He bases this argument on the assertion that "by placing [Bentley's] photograph where he was the only person wearing a white T-shirt fitting the description of the robber, and by telling the victim in advance that one of the photographs in the lineup depicted the person whose fingerprints were found on his car, the police were effectively telling [the victim], 'This is the man.'" The State argues that the evidence supports the trial court's determination that the lineup was not suggestive. The State notes the similarities in build and hairstyle of the men depicted in the array. It asserts that Bentley's white shirt does not make the photo "so dissimilar as to indicate which man's fingerprints were found on the car." We agree with the State.

On review, an appellate court may consider the evidence presented at the suppression hearing[1] as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). In conducting our review, it is a settled principle that "[f]indings of fact made by the trial judge after an evidentiary hearing of a motion to suppress are afforded the weight of a jury verdict, and this court will not set aside the trial court's judgment unless the evidence contained in the record preponderates against his findings." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996) (quoting State v. Adams, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992)). In addition, the Tennessee Supreme Court has stated:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

Id. at 23.

Our analysis of this issue is based upon the United States Supreme Court holdings in Simmons v. United States, 390 U.S. 377 (1968), and Neil v. Biggers, 409 U.S. 188 (1972). In Simmons, the Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384. In Neil v. Biggers, the Court established a two-part analysis which the trial court must apply to determine the validity of a pretrial identification. 409 U.S. at 198-200. First, the trial court must determine whether the identification procedure was unduly suggestive. Id. at 198. Next, if the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Id. at 199. In Tennessee, it is unnecessary to apply the totality of the circumstances test described in Biggers if the trial court determines that the identification procedure was not unduly suggestive. See State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim.

---

[1]The trial court held a suppression hearing immediately before the start of trial. However, the two witnesses who testified during the hearing, Boyd and Detective Hanson, testified consistently with their trial testimony on this matter and provided less material information than they did at trial.

App. 1990) (declining to apply the totality of the circumstances test when a lineup was not found to be unduly suggestive).

When a defendant argues that a lineup is suggestive based on differences between the subjects of the lineup, this Court has required that the subjects be "grossly dissimilar" before it will find that the lineup is impermissibly suggestive. See State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing U.S. v. Wade, 388 U.S. 218 (1967); Young v. State, 566 S.W.2d 895 (Tenn. Crim. App. 1978); Shye v. State, 506 S.W.2d 169 (Tenn. Crim. App. 1973)).

Here, the trial court denied Bentley's motion to suppress Boyd's identification testimony. The court stated that it "[did] not find . . . that there was anything that the Detective did or said to suggest to the victim who he would pick out of the lineup." The court continued, "[T]here was nothing said about who he should select or anything else like that and I think that under all of the case law that this photo identification procedure will be permitted to be considered by the jury . . . ."

Based on our review of the record, we agree with the trial court and conclude that there was nothing unduly suggestive about the photographic lineup or the overall identification process. The lineup contains black and white photographs of six African American males, all of whom appear to be of similar age. Each photograph is uniform in size. The backgrounds of the photos appear to be similar, if not identical. Although Bentley is the only person with an all-white shirt, each man's shirt varies in style and color such that Bentley's white t-shirt is not pronounced. In short, nothing about Bentley's photograph was "grossly dissimilar" to the others in the lineup. Furthermore, Detective Hanson's statement to the victim, prior to his viewing the lineup, that the police had identified fingerprints and his question about whether the victim knew Albert Bentley were not unduly suggestive. See State v. Christopher M. Black, No. M2007-00970-CCA-R3-CD, 2010 WL 681405, at *14 (Tenn. Crim. App., at Nashville, Feb. 26, 2010) (holding detective's statements to witness before a photographic lineup that police had a "'possible suspect'" or a "'DNA match'" were not unduly suggestive), perm. to appeal denied (Tenn. Aug. 26, 2010). Accordingly, the trial court did not err in denying Bentley's motion to suppress.

**II. Sufficiency of the Evidence.** Bentley argues that the proof was insufficient to support his conviction because "the State failed to prove his identity as the perpetrator beyond a reasonable doubt." He argues that the victim's identification testimony, in addition to being inadmissible based on the suggestiveness of the lineup, is incredible because of inconsistencies between his trial testimony and his previous statements to officers. Secondly, Bentley asserts that the evidence was insufficient because "his conviction is based entirely on circumstantial [fingerprint] evidence that fails to establish his guilt beyond a reasonable doubt." The State responds that the proof supports the verdict and that Bentley's arguments

simply "challenge[] the jury's credibility determinations," which "are matters entrusted exclusively to the trier of fact." We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from the evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this Court must decide "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt."

A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt; therefore, a defendant on appeal has the burden of showing that the evidence is insufficient to support the jury's verdict. State v. Thacker, 164 S.W.3d 208, 221 (Tenn. 2005) (citing State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)). A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in the State's favor. Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Issues regarding the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the jury as the trier of fact, and this Court does not reweigh or reevaluate the evidence. Id. (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator, just like guilt generally, may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App.

1993)).  This Court has stated that the identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof.  Strickland, 885 S.W.2d at 87 (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).  In addition, as relevant here, this Court has held that "the testimony of a victim, by itself, is sufficient to support a conviction."  Id. (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)).

To convict Bentley of aggravated robbery, the State was required to prove that he used a deadly weapon to commit an "intentional or knowing theft of property from the person of another by violence or putting the person in fear."  T.C.A. § 39-13-401, -402.  Here, the evidence supports the jury's verdict.  The issue of identity was prominently contested throughout the trial.  Bentley extensively cross-examined the victim and Detective Hanson regarding the photographic lineup procedure and the victim's identification of Bentley as the perpetrator of the instant offense.  The victim said that he was "100 percent sure" that he picked the photo of the person who used a gun to rob him, even before Hanson informed him that the person he picked was also the person whose fingerprints were found on the victim's car.  The victim also identified Bentley in court as the perpetrator.  Furthermore, the parties elicited substantial testimony on the victim's opportunity and ability to observe the perpetrators.  The victim testified that it was daylight during both encounters with Bentley and that each encounter lasted around five minutes.  All of Bentley's arguments in support of this issue were presented to, and rejected by, the jury.  As we previously stated, it is for the jury, not this Court, to decide what weight to give the evidence and to determine the credibility of the witnesses.  Additionally, the fact that some of the evidence, namely the fingerprint evidence, circumstantially proved Bentley's guilt is not a basis for reversing the jury's verdict.  Even though this case consisted of both direct and circumstantial evidence, circumstantial evidence alone is sufficient to support a verdict of guilt.  Based on the trial evidence, a rational trier of fact could have found Bentley guilty beyond a reasonable doubt.  Bentley, as a result, is not entitled to relief on this issue.

## CONCLUSION

Upon review, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE